May it please the court, my name is Doug Roberts and I'm here today on behalf of appellant Paul Kozina. I'd like to reserve five minutes of my time for rebuttal. Paul Kozina was convicted on one count of possessing methamphetamine with intent to distribute. Now because he was caught with a relatively small amount of methamphetamine, the government had to prove his intent through wiretap evidence and evidence seized from Kozina's residence. For the reasons stated in our We raise four main issues, the first of which I'd like to discuss is the roving wiretaps. It's undisputed that if the July and September wiretaps were roving, that they violated Title III's preauthorization provision. At the clearly conventional pole of the wiretap spectrum, we have wiretaps of landlines with one numbers. No one would dispute that that's clearly conventional. At the roving, the clearly roving pole of the spectrum, we have wiretaps of any cellular phone with any cellular phone number that belonged to an individual. No one would dispute that that is clearly roving. The question for this Court is whether a wiretap that's one small step removed from the any phone, any number pole was roving. And the answer in our view is yes. If we look at the circumstances of the wiretaps in this case, first the It noted in the application that Guillermo Zaragoza changed telephone numbers. He had a tendency to do that. And thus it needed to surveil a range of phones and a range of phone numbers from Mr. Zaragoza. So it asked to surveil from a target telephone identified by number, identified by ESN, and then it asked to surveil from all numbers that belonged to that device and all devices, essentially, that the wiretap was roving. Now, do you have authority for that? I mean, I'm trying to figure out. I mean, there's been use of the word roving. Was this labeled roving? Is there a case or some statute that says that that's what dictates roving? Because another extreme end on the roving would be you follow the person with whatever phone or device that is used beyond what may be contemplated at the time of the affidavit in terms of precise number or device. So I'm just trying to figure out what's your authority or is there authority that you both agree on on what constitutes a roving or what you call roving that would require the high-level DOJ approval? Sure. Well, first of all, Title III itself doesn't use the roving language. What it says is that warrants require a particular description of the facility to be seized from unless you get authorization from certain high-level officials at the DOJ. The cases have called that roving wiretaps when you don't meet that particular description requirement. In terms of cellular phones, it's not clear what constitutes roving under the case law. What we can tell is that it seems as if you identify a cellular phone number or cellular phone by its number and only that number, that that is not roving as far as a cell phone is concerned. Well, that's this case, isn't it? It isn't. Then why should we speculate about something hypothetical? Well, Your Honor, it's not hypothetical because the government identified a particular phone number, but then it asked to seize from all other phones. No, but it didn't do it. It just used a number, and that's the only evidence in this case to say that the phone number was roving.  And it's not a big mountain out of a moth hole. Well, in practice, that's correct, Your Honor. Well, that's what we're dealing with, a practice case. Well, I would say that I would submit that there are two sort of crucial stages of wiretaps. There's the application stage and there's the execution of the wiretap order stage. If there is error at either of those points, the remedy under Title III is suppression. Well, why should we? I mean, I can understand the argument made by defense counsel, but it's not a very attractive argument. And I guess in Duran, if we could talk about Duran just for a moment, Duran held that wiretap warrants can cover scenarios such as this one. Here, why does it matter? I mean, isn't that authority to prove or to affirm on these facts? It's not. And, again, I mean, I would go back to the distinction of we have the application, we have the execution, and we have the order as well. In Duran, what the defendant said was, look, the order is in error because, essentially, it didn't identify and other ESNs. And the defendants in Duran, the defendant, not the defendant, but the co-conspirator had changed ESNs or actual devices. And then it said that the execution was in error because it went and got information  What we're saying here is, you know, not a problem with the order, not a problem with the execution. It's a problem with the application. And the way the government frames the question in Duran is interesting. They say it's the same substantive issue because in Duran, the Court addressed whether the government may intercept conversations that were obtained over successor numbers in ESNs. That's not the question. We don't dispute that the government can do that. We just say that the government has to get approval from statutorily identified officials at the DOJ. And that's not what was done here. But the Court approved what was done here in Kusina, correct? The Duran Court? No, in Kusina. Oh, the District Court. Yes, the District Court did approve it, and the District Court approved it under Duran, a case, I might add, that was so off point that neither the defense or the government had identified it in initial briefing of the subject. The Court identified it, and then the parties argued about it, essentially. But it's off point. And it never addressed the roving wiretap issue. This Court only addresses issues that are clearly in front of it. That issue was not presented. And I think that this application ---- You say that issue. I want to make sure I understand. That issue was not presented. What issue was not presented to this Court, Kusina, the District Court in Kusina? The Court in Duran was not presented with the issue of whether or not there was a roving wiretap in violation of the, you know, the preapplication authorization provisions. And on appeal, the Court said what happened below was okay. It did, but again, the defendants never presented the roving wiretap issue to the appellate court. It was never an issue that was presented. In fact, this Court has never, and no court to my knowledge, has addressed this specific question, which is whether a warrant of this sort is roving and thus in need of authorization from one of the statutorily identified Department of Justice officials. But I thought there was a reference in Duran that called that a fixed wiretap or non-roving. It says there was a reference, and it may have been in a footnote, that said that there was no application for a roving wiretap. Okay. There was a footnote in the ---- And so it seems by implication that what was presented was not a roving wiretap, and what was presented is exactly what we have here. I believe, Your Honor, that the footnote you're referring to was in the briefing before the Court of Appeals by either Duran or Roman. It might have been both of them saying that the government could have but did not seek a roving wiretap. That's the reference that I'm familiar with. I don't believe that the Court ever addressed, you know, the roving nature of the wiretap, and certainly neither us nor the government has indicated that that was the case in our briefing on the topic. But again, to sort of segue back into this application versus execution distinction, I think it's very significant. It's not simply a matter of form, and it is substantial. And that's because, you know, as the Giordano Court said, the mature judgment of a particular responsible DOJ official is interposed as a critical precondition to any judicial order. So you have the precondition and the authorization that's needed, and that's there to protect potential targets of wiretaps from these roving wiretaps, which are by their nature far more intrusive than just fixed wiretaps, which identify a particular phone number or a particular phone booth or landline. Well, I guess in your interpretation of fixed, because there's no authority that you have that I can see anywhere that this isn't a fixed wiretap. Well, I think it's roving because the authority establishes as far as cellular phones go, that a fixed wiretap has to identify and limit the application to a specific telephone number. A specific telephone number or device. I think that's arguable. I don't know that there is any particular authority that says if you identify a particular device, that that is a fixed wiretap. Now, admittedly, we would have a more difficult case if that were what was done in here, but it wasn't. We have an identification of a particular number, and then any other number that happens to be attached to that device, an identification of a particular device, and any other number that happens to it. Any other device that attaches to that number, a number that attaches to the device. So it really is the transfer language here that makes it a roving wiretap and allows the government to go beyond one particular phone number, one particular phone, and rove around with its wiretap in order to seize information from various phones. A second argument that we raise is staleness. In this case, the information in the application was far too stale to support probable cause. What the facts show in the application, this is. For two months, Cazina and his wife, Angelica Rodriguez, made a few scattered purchases of ounce-level quantities of methamphetamine. Five months later, after Cazina and his wife move to a different residence, the government applies for a warrant to search their new home for items that, in our view, were not likely to be retrieved and were not because they were not of the sort likely to be taken from one residence to the next and to have survived for the five-month period. This Court employs a holistic view of determining staleness. It is not simple enough to say this person was involved in a drug conspiracy, therefore, staleness lingers indefinitely. It's true, and the Court has said in the Hernandez-Oscar Sega case, that where a defendant plays a pivotal or long-standing role in a conspiracy, probable cause can linger for months, if not years. That ---- Wasn't this long-standing? Excuse me? Wasn't this not long-standing? The conspiracy? I don't know. The conspiracy was not particularly long-standing, I wouldn't say. As, for example, the conspiracy in Hernandez-Oscar Sega went on for years, I wouldn't say that this was a long-standing conspiracy. But more important than the conspiracy is the alleged co-conspirators. And what we know is that Cazina and his wife, Rodriguez, were not involved for long. The evidence in the application showed that they were involved in drug activity for two months, and then it abruptly cut off soon after their arrest at the end of September. We also know from the application that they weren't pivotal players. The government identified them as third-tier, lower-level drug dealers. There is no allegation in this case that Cazina and Rodriguez were producing methamphetamine and might hold on to the sort of equipment that would linger past their activity in, you know, in drug activity. It's a matter of the government searching for currency, narcotics, things used in the packaging of narcotics. These things are not likely, and many courts have held, these things are not likely to linger past a drug dealer, especially a small-time drug dealer and a drug dealer for a short period of time's involvement in the actual selling of drugs. All of these factors are amplified by the fact that Cazina and Rodriguez moved residences after their last reported drug activity. They, again, not likely if, and as the evidence shows, that they weren't involved in drugs after that period, they wouldn't be likely to have moved the, you know, plastic bags and drug-cutting agents that the government was looking to seek at their home. Another factor is that Cazina and Rodriguez really had no relevant criminal history. This is not, again, the Hernandez-Escarcega case, where we had somebody who had been involved in drug dealing or at least allegedly involved in drug dealing for decades. These are folks that had no prior drug arrests. Mr. Cazina had a small criminal record of crimes that had nothing to do with drugs. Ms. Rodriguez had no record to speak of. So, again, this is another factor that militates in favor of a finding of staleness. And, in fact, the staleness was so significant and so severe in this case that the good-faith exception is inapplicable because it would have been unreasonable for any agent to have thought that this warrant was supported by probable cause. The Herada case talks about when there's long, unexplained delays between the search and the info in the affidavit, the good-faith exception does not apply. In the Herada case, the period, the long delay, was 82 days, so just short of three months. Here we have a five-month period and where a move from one residence to another was involved. So, again, I think even here, even more than the Herada case and more than other cases in which the good-faith exception was not found to apply, we have evidence that is so stale that it clearly should not support probable cause. The last point I'd like to make about this search warrant evidence is from an error standpoint, and that is I think it's very obvious with the wiretap evidence that that was key to the government's case of intent with Mr. Cazino. Mr. Cazino was found with 1.6 ounces of methamphetamine on one event, and it's an ambiguous amount in terms of possession, possession with intent to distribute, so they had to prove his intent by the wiretap evidence. The evidence from his house went to the same point, the intent point. They found money. They found baggies which were entered into evidence at trial, and these also go to show, at least in the government's view and presented to the jury, that Mr. Cazino was a drug seller. I see that I'm against my rebuttal time, so I'd like to just depart for now. Thank you. May it please the Court. Suzanne Miles for the United States. The district court correctly denied each of the defendant's motions to suppress the evidence against him in this case, and the district court's decisions and the jury verdict should be affirmed here. Now, starting with the roving wiretap issue, the answer to this issue and the answer to what is a roving wiretap or not a roving wiretap is in the plain language of the statute itself. If you look at Section 2818, that tells you the difference between a roving wiretap and a standard wiretap. 2518 Section 1 addresses standard wiretaps, and what it says is that in order to put a tap on a communication facility, a phone, you need to be able to describe the place that you're searching with particularity, much like a regular search warrant. This Court in Duran said in order to describe a phone with particularity, if you want to tap a phone, you need to provide either the phone number or the electronic serial number, which is the identification for the device itself. In contrast to that, the statute permitted what has come to be called roving wiretaps, and that's in 2818 Section 11, and that sets out a different standard for what you can do. And in those types of wiretaps, what you're doing, what the government is doing, is identifying a person who they believe they have probable cause is engaged in certain criminal activities, but they cannot figure out what facility, what phone that person is going to be using because the person has the ability to drop that phone, to move from one facility to the next. And so what Congress did in 2818 Section 11 was allow the government to be able to tap a person's phone without being able to identify with particularity which phone that person is going to be using, as long as it can meet a higher standard. It does have to go through more internal review in the application before it seeks such an order, and it has to be able to show, because it can't name the place where it's going to be searching, it has to show that there's probable cause to believe that the person that they want to search is involved in the particular crimes that are authorized under the statute, and that there is enough evidence to show that that person will not be using one particular phone, and so the government can't meet the standard of particularity for a regular wiretap. So the question in this case really is not what label you put on what kind of wiretap this is. The question is, did the government meet the particularity requirement of 2818 Section 1? And we did. Under this Court's decision in Duran, which says that we can name, we can identify a phone with sufficient particularity if we identify the phone number and or the electronic serial number. We met both of those. We provided both of those pieces of information. And to answer Your Honor's question, Judge McGeough, Duran did address the roving wiretap issue. In footnote 7, it did. What it said was that here the government met the particularity requirement of 2818.1, and the Court didn't need to look at 2818.11 because the government didn't seek a roving wiretap. So that answers that question squarely, and Duran does control here. This was a standard wiretap. The government met the particularity requirement, and the order was perfectly in compliance with the statute. So all of the evidence taken under this wiretap was admissible. Moving on to the second issue, which was the search warrant in this case. The evidence supporting this search warrant was not stale. The magistrate judge here had a substantial basis for finding that there was probable cause to search the home of Mr. Cozina and Ms. Rodriguez, and there was no error in that decision. Now, what we had here was evidence showing that Cozina was involved in ongoing drug trafficking offenses. This was not a few scattered purchases, as defense counsel would like you to believe. We had evidence of 13 transactions over the course of eight weeks on a regular basis. Not only that, we had evidence that Cozina was continuing his drug trafficking activity even after he was arrested by police and two ounces of methamphetamine was taken from his possession. On September 28th, Rodriguez and Cozina were both arrested. Later that day, or actually the next day, we had a communication between Rodriguez and their supplier asking to resupply them with two ounces of methamphetamine. And two ounces, keep in mind, is somewhere between 400 and 600 doses of methamphetamine. This is not a small amount of meth. So we know that just a day after they were arrested, Cozina's wife asked to reorder the same amount of methamphetamine. And then only three days later than that, on October 2nd, Cozina himself was intercepted speaking with their supplier, Zaragoza, asking for even more methamphetamine. So we had clear evidence in the affidavit in support of the search warrant that Cozina and his wife were engaged in this ongoing drug trafficking conspiracy to a significant degree. We also had sufficient evidence to show that there was a connection between their drug trafficking offenses and their home. What we knew from the affidavit is that on at least one occasion, their supplier, Zaragoza, delivered drugs to Cozina's home. It was the home on Snow Drive, not the Ford Road home. But we knew that there was at least some direct evidence that they were bringing this drug trafficking offenses into their home. At the time that they were arrested on September 28th, both Rodriguez and Cozina gave the police the Ford Road address, indicating a clear connection that they were connected to that address at a time that we know that they were involved in methamphetamine dealing. And this Court's decision, even without that kind of direct evidence, this Court's decision in Angula Lopez shows that the magistrate was on rightful footing to assume that drug traffickers involved in this kind of offense would bring evidence of drug trafficking home with them. With regard to the staleness argument, all of this evidence about the ongoing nature of the offense goes to staleness. And this Court's decision in Pitts is squarely on point. In that case, there was a four-month delay between when the last piece of evidence was gathered and when a search warrant was executed. And the Court held that in that case, where there was similar evidence of an ongoing nature, the defendant in that case had been weekly supplying drugs to an informant. The Court held that where there was evidence of that ongoing kind of conspiracy, that a four-month delay was not, did not create staleness. So the search warrant in this case was perfectly legal, and the magistrate court and the district court should be affirmed in that regard. I'd like to address briefly the question of the communications from Mr. Cosina that were intercepted over the wire. All of the communications that were intercepted over the wire qualify as wire communications by definition under the statute. The statute in 2510 Section 1 defines a wire communication as being an oral transfer, so the transfer of a human voice over a wired facility, a telephone, from a point of origin to a point of reception. In each of the cases here, in all of the 13 calls that were put into evidence involving Mr. Cosina and Ms. Rodriguez, all of the communications qualified as wire communications. Mr. Cosina, even though he was not holding the telephone at the time that he made many of the statements, was a party to the calls that were happening between his wife and their supplier. That's clear from the content of the calls. In many cases, what happened was his wife was a Spanish speaker, as was the supplier, Mr. Zaragoza. Mr. Cosina spoke only English. And what's clear from the transcripts is that Ms. Rodriguez would ask Mr. Cosina certain questions and then convey that information over the wire again to Mr. Zaragoza. So just by definition under the statute, each and every one of the statements that was made in this case and put into evidence qualify as wire communications and were admissible. Isn't there some conversation between him and his wife before the phone is answered? There are three instances in which there were some communication between Mr. Cosina and his wife while the phone was ringing, while she was calling Mr. Zaragoza. That's correct. And in each of those, first of all, those communications still qualify under the definition as wire communications. Why? Because it was the transfer of a human voice from a point of origin over the wire to a point of reception. So the standard, the language of wire communication in the statute, unlike, for instance, oral communication, a wire communication as Congress defined it requires no intent requirement. It's very blank. It says only the transfer of a human voice from the point of origin to a point of reception, and these meet that requirement. If the person who's transmitting it has no idea that the FBI has bugged his house and that bug transmits it, then that's a wire communication? No, Your Honor. And that would qualify as an oral communication, where the bug is actually at the point of origin where it's not being transferred over a phone. Then we're in the land of an oral communication, which brings us down to a different subsection of the statute. So that's what happened in a lot of the cases that were cited in the briefs, where you had a wire tap on the target's phone, and the phone was left off the hook, and you essentially just have a bug in his apartment. And there's communications that are happening that don't involve the phone whatsoever. That does require an intent. If you have a reasonable expectation of privacy, then you are protected from that kind of a bug. That's not the case we had here. What we have here is someone picking up a phone, dialing the phone, making a connection between their telephone and a target's telephone, and then speaking on this end, and having those communications transferred over just as if there was somebody on the other end. And those bring us into the heartland of a wire communication under the statute's definitions. But if the bug went to a phone and it was transmitted over a wire to that phone, then what? It would depend on whether the microphone that we're talking about meets the definition of a wired facility for purposes of the statute. What falls into the heartland are telephones, and that's what we're dealing with here. So any conversation right before you pick up the phone, or before the phone starts ringing, does that constitute a wire communication? It depends on which side of the phone you're on, Your Honor. So if you are the one that has picked up a telephone and actively dialed and made a connection with another phone, and that other phone is tapped, then whatever you transfer from your point to that tapped phone is subject to interception under the definition. And here was the conversation while the phone was ringing to Mr. Cosina. Is that right? Zaragoza was the target. Zaragoza. How does the statute describe it? Is it a wire communication or what? It is described as a wire communication. How can it be a communication if you're not intending to communicate? By the definition, because you have a point of origin and a receptive phone. And so once those two phones are connected, just like you might not have someone pick up, it might go to voicemail, Your Honor, in which case you wouldn't have a human person on the end of the line. But there's no doubt that that falls within the definition of a wire communication under the statute. So there is nothing in the statute that requires either an intent to convey or an actual person on the other end picking up the phone. What it does require is that a connection over wire facilities be made, and that happens when a person picks up their phone and intentionally dials in and makes that connection with the target phone. Keep in mind, too, here that the reason that there is this lesser standard is because we didn't have a tap on Rodriguez's phone. It was only the fact that she called in to the wire tapped phone, into Zaragoza's phone, who we had already established there was probable cause that that phone was being used in connection with drug trafficking offenses. And in the second wire tap order, the August order, Rodriguez actually was one of the named interceptees. So we were aware, and the court already authorized, that calls coming from her phone were subject to interception. So it's the connection between her and a target to whom probable cause has already been established over a facility for which probable cause has already been established that makes this communication fall within the statute and fall within the statutory definition. So the district court was correct in finding that these calls were admissible. And it's also important to keep in mind what we're talking about. So there were 39 calls total that were put into evidence here. Thirteen of them involved Ms. Rodriguez and or Mr. Cozina. Only three of those calls had any pre-pickup statements. And there were only three statements that happened before the phone was picked up. One of them, which you can find on SER 323, so the three calls that are at issue are at SER 323, SER 350, and SER 284. In the first one, in 323, Mr. Cozina says he's getting garbage. That's the statement that was picked up. When you listen to the rest of that call, what Ms. Rodriguez says in the remainder of the call is complaining about the quality of the methamphetamine that Mr. Zaragoza had given them in their last deal. So what Mr. Cozina said was clearly transmitted and transferred in what were obviously wire communications during the bulk of that call. Likewise, at SER 384, Mr. Cozina's statements there also were repeated by Ms. Rodriguez after Mr. Zaragoza was picked up, picked up the phone. Mr. Cozina said, there's a Hollywood video. Meet him at the parking lot right by the Hollywood video. And when Mr. Zaragoza picked up the phone, one of the first things that Ms. Rodriguez said to him was, in setting up where they were going to meet for this particular drug deal, she said, let's meet by the Hollywood video. Do you know where that is? So the content of Mr. Cozina's calls were repeated by Ms. Rodriguez during the standard part of the wiretap. There was only one other statement at SER 350 where Mr. Cozina says, tell him it's $100 right now. Can you help me out? It's only what? That we don't know that from reading the call, it doesn't seem as though Ms. Rodriguez repeated that. And that is the only statement that's being challenged here that wasn't repeated by once the phone was actually picked up. So in terms of even if you find that these statements don't meet the wire communication definition, there's clear harmlessness here. Unless the Court has any questions regarding the co-conspirator statement, I think the district court's decision in that regard is clearly on point with this Court's precedent and with the standard definition of a co-conspirator statement. And unless the Court has any other questions, we'll submit on our briefs. Thank you. I'd like to address the background conversations for a moment. I think the government's playing a little loose and fast with the point of origin and the point of reception. In their brief to this Court on page 56, they identified the point of reception   Not Zaragoza's cellular phone, but Rodriguez's cellular phone. That's a degree removed further than I would make, but it's very obvious that the point of reception, the conversation, the communications between Kazina and his wife, the point of reception is Rodriguez. The point of origin is Zaragoza. There is no need to use a wire to convey the oral transfer, between Kazina and Rodriguez, because they are standing in the same room. The government surely recognized this when it applied for the warrant, because it said, we want to seize wire communications, and we want to seize background conversations in the vicinity of the target phone, that being Zaragoza's. So they know that background conversations are not wire communications. If that's the case by the non-target telephone, it's certainly the case, or by the target telephone, it's certainly the case by the non-target telephone in this case. So that's the first point I'd make. The second point is, because they're not wire communications, they're oral communications, and Kazina certainly had a reasonable expectation of privacy in these oral communications. The zone of privacy, there's privacy between Kazina and Rodriguez. They're standing or sitting wherever they are in a residence, in a car, whatever it may be. There's reasonable expectation of privacy in those conversations. The Court has held that when a person speaks over the telephone, can also reasonably assume privacy in that as well. So then during the in-use statements, the statements that are made by Kazina, while Rodriguez is on the telephone with Zaragoza, Zaragoza becomes part of this zone of privacy and is included in Kazina's reasonable expectation of privacy. What we have here are oral communications in which Kazina had a reasonable expectation of privacy. And, of course, they're not background conversations in the vicinity of the target telephone, because Kazina and Rodriguez were together. If they were in the vicinity or same physical space as Zaragoza, there'd be no need for a telephone. So these conversations, these background conversations are outside the scope of the warrant and should have been suppressed for that reason. In terms of their error, in all of them, the non-use statements and the in-use statements that are being challenged, Kazina was, by the government's view, making statements related to, A, selling drugs, buying drugs, the price of drugs, and the meeting place for getting drugs. These are all clearly relevant to his not only purchasing drugs from Zaragoza, but also his intent, in the government's view, again, to sell those drugs once he got them. And that's important because, going back to my original point, this is not a significant amount of methamphetamine that Mr. Kazina was caught with. It was 1.6 ounces. Mr. Kazina's co-defendant, Juan Zaragoza, not to be confused with the target of the wiretaps, Guillermo Zaragoza, but Juan Zaragoza was tried with Mr. Kazina, was found to have 6 ounces of methamphetamine on him. Very little wiretap evidence, no search evidence to speak of, and was convicted of simply simple possession. The jury acquitted him of possession with intent to distribute and convicted him on simple possession. So that shows that this evidence, the conversations, and, again, the search evidence, too, is very relevant to the intent and, in fact, central to the government's case for intent. What happened to Kazina's wife? Kazina's wife was tried separately. The trials were severed. Very different defenses. When was she convicted? She was convicted of conspiracy to distribute, but interestingly not, my understanding is, not possession with intent to distribute. She was acquitted of that and then convicted of the larger conspiracy. Very different case than ours here. The last point I'd like to make, just turning back to the scaleness very quickly, the government says that these conversations after the arrest militate against scaleness. I actually think that they support scaleness. Allegedly, there was a conversation between Ms. Rodriguez and Mr. Zaragoza to purchase more drugs, and then another conversation. The government never followed up on these. They did not do any stakeouts. They did not, you know, try to seize the drugs or arrest Kazina again. They never followed up on these. And so it shows a very distinct cutoff between Kazina and Rodriguez's drug activity and then nothing, radio silence for five months. And that's, I mean, I think, again, that's evidence that there was scaleness. And, in fact, the officers really should have reasonably been questioning whether there was probable cause in support of these warrants. Thank you very much. Thank you, Counsel. The case is arguably submitted. All rise.
judges: Reinhardt, Noonan, Murguia